**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

REGINA BROWN,

        *Plaintiff*,

    v.

ALEJANDRO MAYORKAS,

        *Defendant*.

Civil Action No. 20-3107 (TJK)

## MEMORANDUM OPINION AND ORDER

Regina Brown, a black woman, sued the Secretary of the Department of Homeland Security, or DHS, under Title VII of the Civil Rights Act of 1964 and the Equal Pay Act of 1963 for various discriminatory actions she allegedly experienced while employed by DHS. Defendant moves to dismiss all but one of Brown's claims for failure to state a claim. Defendant argues that Brown insufficiently alleged most of her disparate-treatment, retaliation, and disparate-impact claims under Title VII, and her sex-based pay-discrimination claim under the Equal Pay Act. For the below reasons, the Court will grant Defendant's partial motion to dismiss.

## I.    Background

According to the operative complaint, Defendant violated Title VII and the Equal Pay Act during Brown's tenure as a Management and Program Analyst ("program manager") at U.S. Immigration and Customs Enforcement ("ICE"), a component of DHS. *See* ECF No. 20 ("Compl.") ¶¶ 1, 7, 37–40. Brown claims: (A) disparate treatment based on her sex or race; (B) retaliation for engaging in protected activity; (C) disparate impact based on sex or race; and (D) sex-based pay discrimination. *Id.* ¶¶ 37–40. Below, the Court addresses the relevant allegations supporting each claim.

A.      Disparate-Treatment Claims

Brown alleges that Defendant unlawfully carried out three employment actions based on Brown's race or sex.  In 2018, Brown served as program manager for the Border Enforcement Analytics Program ("BEAP") at ICE.  Compl. ¶ 19.  The first unlawful employment action, Brown says, occurred in March 2018 when Brown's supervisors "forcibly reassigned" her from BEAP to another ICE program known as FALCON.  *Id.* ¶ 22.  As part of the transfer, she had to hand over her BEAP responsibilities to two white, male special agents, Benjamin Teed and Evan Campanella.  *Id.*  And at her new FALCON post, she took on the duties of a co-worker two pay grades ("GS" levels) her junior.  *Id.* ¶¶ 22, 33.

Second, Brown claims Defendant overlooked her for a position once she had transferred to FALCON.  Compl. ¶ 34.  In August 2018, the unit chief announced that Campanella, not Brown, would immediately assume the role of acting section chief over the combined BEAP and FALCON programs, now renamed RAVEn.[1]  *Id.* ¶ 25.  Brown alleges, however, that she was "more qualified for the promotions received by the white males," including Campanella's promotion, and she "desired to be promoted to [those] positions."  *Id.* ¶ 34.

Third, Brown points to her second lateral transfer, this time from FALCON to HSINET/SharePoint, another ICE program.   Compl. ¶¶ 26–29.   Because of his promotion, Campanella had essentially become Brown's acting first-line supervisor at FALCON.  *Id.* ¶ 25.  Thus, within a week of Campanella's promotion, acting section chief of HSINET/SharePoint Matthew Grant "proposed" that Brown transition to HSINET/SharePoint, where she would continue to work as a program manager.  *Id.* ¶ 26.  This would place Brown outside Campanella's supervision.  *Id.*  Then, in September 2018, Grant "requested that [Brown] agree to be reassigned"

---

[1] For simplicity, the Court will refer to this position as "acting section chief."

to HSINET/SharePoint because of an "impending retirement," *id.* ¶ 27, stating in an email that "the decision was his [meaning Grant's] to make," *id.* ¶ 28.  In Brown's view, she faced the "threat of, or the involuntary 'choice' to either work under the purview of [Special Agent] Campanella or transfer to a less prestigious and less desirable position for the second time in less than a year." *Id.* ¶ 33.  So she "reluctantly agreed" to transfer.  *Id.* ¶¶ 28–29.  HSINET/SharePoint was then headed by Special Agent Dave Bearon, a white man.  Compl. ¶ 29.

Brown calls these three events—(1) her first transfer from BEAP to FALCON, (2) her non-selection for acting section chief, and (3) her second transfer from FALCON to HSINET/SharePoint—"humiliating and damaging" to her professional reputation and "discriminatory." Compl. ¶ 33.

### B.    Retaliation Claims

Brown's retaliation claims rely on the same employment actions discussed above, all of which she says came about *because* she had engaged in a statutorily protected activity.  Brown explains that she engaged in protected activity when she sought to "oppos[e]" Defendant's allegedly unlawful discrimination by filing an "EEO complaint" with the Equal Employment Opportunity Commission ("EEOC").  *See* Compl. ¶¶ 20, 37.  She alleges she "exercised her right to file an EEO complaint" on February 13, 2018.  *See id.* ¶ 20.  That is, it appears she made initial contact with the EEOC on that date, but she does not specifically allege that she *filed* the actual EEO complaint on that date.  In any event, the next day, she alleges that she notified her boss, Section Chief Christopher Bracken, that she had started the EEO-complaint process.  *Id.* ¶ 21.  And within hours, she alleges, Bracken emailed Brown that she would be transferred: "[W]e plan to have you lateral into the Program Manager duties for the Falcon Role."  *Id.*  Defendant then transferred Brown from BEAP to FALCON on March 20, 2018.  *Id.* ¶ 22.  Brown concludes this transfer was "retaliatory."  *Id.* ¶¶ 21, 33.

But the Complaint leaves out important context reflected in Brown's own EEO complaint.[2] ECF No. 13-3 at 4–7.  There, Brown wrote that, on February *8*, 2018, Bracken had "informed [Brown]" that she "was being removed" from her program-manager post with BEAP.  *Id.* at 7.  Indeed, Brown's impending transfer was the *basis* of her EEO action.  *Id.*  So the email she received from Bracken a week later explaining that Defendant planned "to have [her] lateral," was not the first time she had been informed of those plans.  *See* Compl. ¶ 21.  They were launched no later than February 8, 2018—*before* Brown contacted the EEOC and notified Bracken that she had begun the EEO complaint process.

Besides her transfer from BEAP to FALCON, Brown claims that her non-selection to acting section chief and later transfer from FALCON to HSINET/SharePoint were also "retaliatory," Compl. ¶ 32, based on her EEO engagement.  She also explains that Defendant retaliated against her by excluding her from meetings, high-level briefings, and significant correspondence related to certain programs, such as FALCON and RAVEn.  *Id.* ¶ 33.

### C.    Disparate-Impact Claim

Next, Brown raises a disparate-impact claim.  Central to that claim is a distinction between two employee classifications within DHS: 0300 and 1811.  Brown's program-manager position fell under the 0300 classification.  Compl. ¶ 12.  Such positions "require knowledge of the

---

[2] When, as here, a complaint "makes specific reference to [an] EEO Complaint . . . [,] the court may consider the EEO Complaint without converting the defendant's motion to dismiss into a motion for summary judgment."  *Hudson v. Children's Nat. Med. Ctr.*, 645 F. Supp. 2d 1, 5 n.5 (D.D.C. 2009).  Even had Brown not specifically incorporated by reference her EEO complaint, Brown's complaint refers to her "EEO complaint," and that document is central to her retaliation claims.  Compl. ¶¶ 20, 21, 36.  Thus, the Court may consider it.  *See Spence v. Wolf*, No. 19-cv-2919 (TJK), 2020 WL 6075727, at *4 n.4 (D.D.C. Oct. 15, 2020) ("On a motion to dismiss for failure to state a claim, a defendant may submit an indisputably authentic copy of a document referred to in the complaint and central to the plaintiff's claim even though the plaintiff did not incorporate the document by reference or attach it to the complaint." (citation omitted)).  For all these reasons, and because Brown has not challenged the EEO complaint's veracity, *see generally* ECF No. 15; ECF No. 24, the Court now considers it.

substantive nature of agency programs and activities, agency missions, policies, and objectives, management principles and processes, and the analytical and evaluative methods and techniques for assessing program development or execution and improving organizational effectiveness and efficiency." *Id.* ¶ 30. By contrast, Campanella, Teed, and Bearon were classified under 1811. *Id.* ¶ 29. 1811 employees are "criminal investigators assigned to case work and investigating criminal activity for Homeland Security Investigation[s]." *Id.* ¶ 12.

Brown's theory for disparate impact rests on Defendant's alleged "discriminatory practice" of "promoting or providing temporary duty assignments to 1811s into lead program manager and supervisory roles in lieu of more qualified 300 series employees," which disadvantages minority and female employees. Compl. ¶ 13. In particular, Brown says ICE often puts 1811 employees, who are overwhelmingly white men, into positions that should be filled by 0300 employees, who are mainly minority women. *Id.* ¶¶ 13–15, 17–18. She adds that ICE writes up supervisory positions for 1811s contrary to their "assigned duties," which precludes 0300 employees from consideration. *See id.* ¶¶ 13, 17. To support this "systemic problem," as she calls it, Brown highlights statistics showing that higher GS levels comprise more white men than lower GS levels and that 1811 positions are mainly filled by white men. *Id.* ¶¶ 14–15. These disparities, she alleges, support the inference that minority women's promotion opportunities are fewer than white men's. *Id.* She concludes that "these policies and practices have a disparate impact that is discriminatory in effect upon minorities and female employees." *Id.* ¶ 13.

### D. Sex-Based Pay Discrimination Claims

Finally, Brown alleges she received less pay than her male colleagues. In particular, she alleges that when she transferred from BEAP to FALCON, the two men, Teed and Campanella, who overtook her BEAP job "would be compensated an additional 25% salary." Compl. ¶ 23.

She alleges a similar pay disparity occurred at HSINET/SharePoint, where she alleged "she would receive 25% less in income" than Bearon.  *Id.* ¶ 29.

Brown explains that 1811 employees—like Teed, Campanella, and Bearon—are eligible for law enforcement availability pay ("LEAP"), a form of "a premium pay afforded to law enforcement officers or criminal investigators for work or the availability to work substantial amounts of 'unscheduled' work conducting[] or managing investigations related to alleged or suspected criminal violations of Federal laws."  Compl. ¶¶ 16, 23, 29.  And LEAP "entitles the 1811 series to an additional 25% of their original salary."  *Id.* ¶ 16.

The issue, as Brown sees it, flows again from Defendant's "misuse of job classification."  Compl. ¶ 16.  She alleges that "Defendant misclassifies headquarters positions by temporarily assigning, permanently assigning, or promoting employees in the 1811 series into positions where the duties do not involve performing investigations related to specific acts of illegal or unlawful activity" or "do not require the use of arrest authority."  *Id.* ¶ 17.  Because of this misclassification, the positions 1811 employees assume "negate[] the need for the 'substantial hours' requirement to claim [LEAP]."  *Id.* ¶ 18.  As a result, 1811 employees, Brown alleges, can work "8-hour workday[s] while collecting availability pay for conducting the same or substantially equal work as their non-1811 counterparts."  *Id.*  And as applied here, Brown says she performed the "same duties" as Campanella and Teed, *id.* ¶ 23, and had "the same role and responsibilities" as Bearon, *id.* ¶ 29, but still suffered a pay disparity.

*   *   *

Defendant now partially moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), arguing that Brown has failed to state a claim for disparate treatment (except for claims arising out

of Brown's transfer to FALCON), retaliation, disparate impact, and sex-based pay discrimination. *See* ECF No. 22.  Brown opposes that motion.  ECF No. 24.

## II.     Legal Standard

To survive a Rule 12(b)(6) motion to dismiss for failure to state a claim, a plaintiff's complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). "[D]etailed factual allegations" are unnecessary to survive a motion to dismiss, *id.*, but a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). Upon review, a court must "accept as true all of the factual allegations contained in the complaint," *Atherton v. District of Columbia*, 567 F.3d 672, 681 (D.C. Cir. 2009) (quotation omitted), but it need not adopt "inferences that are unsupported by the facts set out in the complaint," *Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 84 (D.D.C. 2012).

## III.     Analysis

Defendant moves to dismiss all but one of Brown's Title VII claims as well as her sex-based pay-discrimination claim for failure to state a claim under Rule 12(b)(6).  The Court agrees and will grant Defendant's motion.

### A.     Title VII Claims

#### 1.     Brown Fails to State a Disparate-Treatment Claim for the Challenged Actions

Among other things, Title VII prohibits employment discrimination based on race, color, or sex.  42 U.S.C. § 2000e-2(a)(1).  Its "primary objective" is "to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees."  *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 417

(1975) (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 429–30 (1971)).  To establish a disparate-treatment claim under Title VII, a plaintiff must allege that (1) she is a member of a protected class, (2) she suffered an adverse employment action, and (3) that action implies discrimination.  *See Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002).

Brown's complaint advances three claims for disparate treatment, alleging that Defendant violated Title VII when it: (1) transferred Brown from BEAP to FALCON; (2) passed Brown over for promotion to acting section chief in favor of a white, male employee; and (3) later transferred Brown to HSINET/SharePoint.  Defendant moves to dismiss only the second and third of these claims.  ECF No. 22-1 at 10–11.  Both claims fail to state a disparate-treatment claim, so the Court will dismiss them.

### a.    Non-Selection for Acting Section Chief

Defendant first takes aim at Brown's contention that it discriminated against her when it elevated Campanella, a white man, instead of Brown, to the acting-section-chief position.  Compl. ¶¶ 25, 32.  Brown claims that at "all relevant times, [she] continued to be qualified to fulfill the requirements of th[is] position[], and desired to be promoted to th[is] position[]" and that "her qualifications were plainly superior" to Campanella's.  *Id.* ¶ 34.  Among other reasons, Defendant argues these allegations are deficient because Brown failed to allege that she conveyed her interest in being selected for the position to her superiors or was qualified for it.  ECF No. 22-1 at 12.

To establish a prima facie case for a discrimination claim based on non-hiring or non-promotion, a plaintiff must show that she (1) applied for, (2) was qualified for, and (3) was rejected from (4) an available position.  *Greer v. Bd. of Trs. of Univ. of the D.C.*, 113 F. Supp. 3d 297, 310 (D.D.C. 2015) (citing *Morgan v. Fed. Home Loan Mortg. Corp.,* 328 F.3d 647, 650–61 (D.C. Cir. 2003)).  If a plaintiff could not formally apply for a position because it was "never opened . . . to competition," a plaintiff may satisfy her burden by showing that she had shown interest in taking

on the position.  *See Cones v. Shalala*, 199 F.3d 512, 518 (D.C. Cir. 2000).  Ultimately, what matters is that a plaintiff makes "every reasonable attempt to convey [her] interest in the job to the employer."  *Id.* (quoting *EEOC v. Metal Service Co.*, 892 F.2d 341, 348 (3d Cir. 1990)).

Granted, to survive a motion to dismiss, a plaintiff need not make out a prima facie case of discrimination.  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1114 (D.C. Cir. 2000).  But a plaintiff must still allege "facts that, if true, would establish the elements of each claim."  *Greer*, 113 F. Supp. 3d at 310.  Thus, "the Court may explore the plaintiff's prima facie case at the dismissal stage to determine whether the plaintiff can ever meet [her] initial burden to establish a prima facie case for Title VII discrimination."  *Tressler v. Nat'l R.R. Passenger Corp.*, 819 F. Supp. 2d 1, 5 (D.D.C. 2011) (quotation omitted); *see, e.g.*, *Greer*, 113 F. Supp. 3d at 310 (dismissing case under Rule 12(b)(6) when the plaintiff did "not allege that he applied for the positions given to the individuals identified in his amended complaint").

Brown has failed to state a claim for her non-selection for the acting-section-chief position for two reasons.  First, she did not allege that she showed interest in the position.  Second, she did not allege she was qualified for it.[3]

On the former deficiency, Brown argues that she could not have applied to the position because section chief positions are "typically reserved for the 1811 series" and because "[a]cting

---

[3] Beyond the acting-section-chief position, Brown generally suggests Defendant passed her over for other "positions" or "promotions."  *See* Compl. ¶¶ 12, 24, 34.  For instance, Brown mentions once that she was "denied" the "opportunity to become the National Program Manager for FALCON."  *Id.* ¶ 32.  But that lone reference and her other bare allegations about "positions" and "promotions" fail to adequately state a claim for non-selection because, without more, they do not come close to alleging all the facts that are ultimately required to support such a discrimination theory.  *See Greer*, 113 F. Supp. 3d at 310.  Brown also references the section-chief position of the "CPI-BEAP" program.  Compl. ¶ 9.  But as Defendant previously explained, such a claim is "time-barred" for failure to exhaust.  ECF No. 13-2 at 13–14.  In any event, Brown concedes that discussion is only "background evidence."  Compl. ¶¶ 9, 11.  Thus, the Court focuses only on the acting-section-chief position to analyze Brown's discrimination claim based on non-selection.

positions are not competed out for selection." ECF No. 24 at 10. But in that case, a plaintiff must still allege that she "made every reasonable attempt to convey [her] interest in the job to the employer." *Cones*, 199 F.3d at 518; *see also Greer*, 113 F. Supp. 3d at 310–11. Brown has not alleged that she made her supervisors (or *anyone*) aware of her interest in the acting-section-chief position. She explains only that "[a]t all relevant times" she was "qualified" for and "desired to be promoted to" that position. Compl. ¶ 34. She does not even imply that she communicated these views to Defendant and that her efforts failed. The mere desire for a position cannot pass for a demonstrated interest. Thus, she has failed to state a claim for disparate treatment based on her non-selection to acting section chief.

On the latter deficiency, Brown reasons that certain unspecified headquarters positions "should be classified in the 0300-job classification" based on the required duties and responsibilities. Compl. ¶ 17. But she does not identify those duties or responsibilities or provide any facts from which to infer the duties of an acting section chief. Further, Brown's only description of her potential qualifications is her statement that "[a]s a Program Manager she had responsibility for handling all aspects of [BEAP], including the business model, budget, [and] contracts." *Id.* ¶ 19. At most, these facts show Brown's qualifications to be *program manager*. But the complaint lacks any allegations from which the Court could conclude that Brown's experience as program manager qualified her for acting section chief, a separate role. Thus, Brown has failed to state a claim for disparate treatment based on her non-selection to acting section chief.

### b.       Transfer to HSINET/SharePoint

Defendant next challenges Brown's allegation that Defendant discriminated against her when it transferred her from FALCON to HSINET/SharePoint, a "less prestigious and less desirable" program. Compl. ¶ 33. Defendant argues that Brown has failed to allege that this was an adverse employment action because she transferred to HSINET/SharePoint voluntarily, and

regardless, that no alleged facts support the view that Defendant transferred her because of her membership in a protected class.  ECF No. 22-1 at 16–17.

Recall that, to make a claim for a disparate treatment, a plaintiff must show she "suffered an adverse employment action."  *See Stella*, 284 F.3d at 145.  In *Brown v. Brody*, the D.C. Circuit had held that "a plaintiff who is made to undertake or who is denied a lateral transfer . . . does not suffer an actionable injury unless there are some other materially adverse consequences affecting the terms, conditions, or privileges of her employment or her future employment opportunities such that . . . the plaintiff has suffered objectively tangible harm."  199 F.3d 446, 457 (D.C. Cir. 1999).  But since the parties' briefing, the Circuit overruled that holding in *Chambers v. District of Columbia*, 35 F.4th 870, 872, 882 (D.C. Cir. 2022) (en banc).  There, it held that "an employer that transfers an employee or denies an employee's transfer request because of the employee's race, color, religion, sex, or national origin violates Title VII by discriminating against the employee with respect to the terms, conditions, or privileges of employment."  *Id.* at 872.  Under that new framework, even "garden-variety" discriminatory transfers—that is, transfers that do not cause a plaintiff "objectively tangible harm"—still violate Title VII.  *See id.* at 874–75, 879.  Thus, to allege an "adverse employment action" in support of a disparate-treatment claim, it is enough for a plaintiff to allege that a discriminatory involuntary transfer occurred.  This change in law does not save Brown's HSINET/SharePoint-transfer claim, however, because it still has two defects.

First, the complaint does not allege that Defendant forced her to transfer from FALCON to HSINET/SharePoint.  Instead, it says Grant first "proposed" that transfer and later "requested that [Brown] agree" to that transfer because of an "impending retirement."  Compl. ¶¶ 26–27.  Brown says that "her only option was to either work under the supervision of Mr. Campanella or work

with a new Special Agent." *Id.* ¶ 28.  She later called it an "involuntary 'choice.'" *Id.* ¶ 33.  But

in the end, though "reluctantly," Brown "agreed." *Id.* ¶¶ 28, 29.

Voluntary employment decisions cannot generally give rise to claims of discrimination

under Title VII.[4]  *See, e.g.*, *Aliotta v. Bair*, 614 F.3d 556, 567 (D.C. Cir. 2010) (employees who

accepted a buyout did not suffer adverse employment action).[5]  But when a plaintiff retires or

resigns, she can rely on the "constructive discharge" doctrine "to overcome the presumption of

voluntariness and demonstrate she suffered an adverse employment action by showing the

resignation or retirement was, in fact, not voluntary." *Id.* at 566.  A constructive discharge,

however, "does not occur when an employee leaves an unpleasant but objectively tolerable job

because alternatives have become more attractive, even if the employer's misbehavior creates the

unpleasantness or its largesse affirmatively increases the appeal of the employee's alternatives."

*Stewart v. White*, 61 F. Supp. 3d 118, 132 (D.D.C. 2014) (quotation omitted) (alteration adopted);

*Leeth v. Athens/Limestone Hosp., Inc.*, No. 5:7-cv-956 (SLB), 2010 WL 11562097, at *13 (N.D.

Ala. Mar. 23, 2010) ("The law is clear that an employee's voluntary choice between two options,

---

[4] *Chambers* did not alter the threshold requirement that, to state a cognizable claim for Title VII
discrimination based on an employment transfer, the transfer must be involuntary.  *Brown* dealt
with an "involuntary" transfer.  *See* 199 F.3d at 455; *Chambers*, 35 F.4th at 872 (characterizing
*Brown* as reaching "*forced* acceptance[s] of a job transfer" (emphasis added)).  Thus, *Brown*'s
requirement that a plaintiff show "objectively tangible harm" for a transfer-based disparate-
treatment claim presupposes an involuntary transfer.  199 F.3d at 457.  Indeed, the Court is
unaware of any case in which a voluntary transfer gave rise to a sufficiently pleaded discrimination
claim.  Instead, before *Chambers*, courts regularly applied *Brown* to involuntary transfers.  *See,
e.g.*, *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 844 (D.C. Cir. 2001); *Sharpe v. Bair*, 580
F. Supp. 2d 123, 131–32 (D.D.C. 2008).  So even after *Chambers*, to allege a Title VII
discrimination claim based on a transfer, a plaintiff must still first allege it was, in fact, involuntary.

[5] *See also Sercer v. Holder*, 104 F. Supp. 3d 746, 751 (E.D. Va. 2015) ("Whether Plaintiff's
decision to transfer was based on [her new post's] appeal or her frustration with [her old post] is
ultimately irrelevant to her claim that this voluntary transfer was somehow an unlawful adverse
employment action due to sex discrimination.").

albeit unpleasant choices, is not an adverse employment action for which her employer may be accountable.").

A plaintiff might theoretically apply the constructive-discharge doctrine to a transfer by alleging a "constructive involuntary transfer." *See, e.g.*, *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 204 (D.D.C. 2012).[6]  But here, Brown does not allege any such "constructive involuntary transfer" theory.  To start, Brown alleges no facts from which the Court could conclude that Brown lacked a choice to decline Grant's transfer request.  The closest she comes is her allegation that she agreed to transfer to HSINET/SharePoint "reluctantly" and her unadorned assertion that she made an "involuntary 'choice.'"  Compl. ¶¶ 29, 33. But the alleged "involuntary 'choice'" was that of either "work[ing] under the supervision of Mr. Campanella" or with "a new Special Agent."  *Id.* ¶¶ 28, 33.  Evidently, she disliked the former and preferred—and chose—the latter "option."  *Id.* ¶ 28.  These facts, as alleged, reveal only that Brown left "an unpleasant but objectively tolerable job because alternatives . . . become more attractive."  *Stewart*, 61 F. Supp. 3d at 132.  That is not enough to state a claim that she faced a constructive involuntary transfer.

Second, even if Brown's transfer were involuntary, Brown still alleges no facts suggesting that unlawful discrimination motivated Defendant's decision to transfer her to HSINET/SharePoint.  "[A]t the motion to dismiss stage, 'there is a very low bar for alleging an inference of discrimination.'"  *Azzam v. District of Columbia*, No. 19-cv-3365 (TSC), 2022 WL 4182187, at *6 (D.D.C. Sept. 13, 2022) (citation omitted).  But there is *a* "bar" all the same.  *See*

---

[6]*See also, e.g.*, *Hooper v. State of Md., Dep't of Hum. Res.*, 45 F.3d 426, 1995 WL 8043, at *5 (4th Cir. 1995) ("[A] constructive discharge theory is the only legal theory upon which Hooper could show that his request to be transferred was involuntary."); *Brown v. Potter*, 516 F. App'x 563, 565 (6th Cir. 2013) ("[The plaintiff] transferred . . . voluntarily, and she offers no support for a forced-transfer theory of liability.").

*id.* (detailing the "sufficient 'factual heft'" in plaintiffs' allegations that supported an "inference that [the challenged] actions were discriminatory").

Brown concludes generally that "Defendant's reasons for transferring [Brown] on multiple occasions and not promoting [Brown] were motivated by her sex and race."  Compl. ¶ 37.  But "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  And Brown never specifically alleges that her race or sex motivated the HSINET/SharePoint transfer.  Grant, who said that "the decision [to transfer Brown to HSINET/SharePoint] was his to make," asked Brown to do so on account of an "impending retirement."  Compl. ¶¶ 27–28.  Brown says this was a "guise" of some kind, although she never says what the "guise" concealed.  *See id.* ¶ 27.  Even construing that remark generously as an accusation of improper animus, it is no more than a restatement of an element of Brown's claim.  The mere fact that Grant is a white man, Compl. ¶ 27, does not "give[] rise to an inference of discrimination."  *See Stella*, 284 F.3d at 145.  Without more, Brown has not stated a disparate-treatment claim based on her transfer to HSINET/SharePoint.

### 2.        Brown Fails to State a Retaliation Claim

Defendant also moves to dismiss Brown's Title VII retaliation claims because Brown has not sufficiently alleged any causal link between any alleged adverse action and Brown's protected activities, and because Defendant's supposed retaliatory actions were not materially adverse.  ECF No. 22-1 at 17–20.

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To survive a motion to dismiss, a claim for retaliation under Title VII must

contain sufficient factual matter, accepted as true, to plausibly establish that (1) the plaintiff engaged in a statutorily protected activity; (2) the plaintiff suffered a materially adverse action; and (3) there is a causal connection between the two.  *See Taylor v. Small,* 350 F.3d 1286, 1292 (D.C. Cir. 2003); *Holcomb v. Powell*, 433 F.3d 889, 902–03 (D.C. Cir. 2006).

For the second prong, Title VII's antiretaliation "provision covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).  An adverse action is one that "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*  Such actions "encompass a broader sweep of actions than those in a pure discrimination claim" because "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment' and may extend to harms that are not workplace-related or employment-related so long as 'a reasonable employee would have found the challenged action materially adverse.'" *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 n.4 (D.C. Cir. 2008) (quoting *Burlington*, 548 U.S. at 64, 68).[7]  And a "court must dismiss a retaliation claim where the plaintiff has not alleged facts that could plausibly constitute a materially adverse action." *Redding v. Mattis*, 327 F. Supp. 3d 136, 144 (D.D.C. 2018), *aff'd sub nom. Redding v. Austin*, No. 21-5100, 2022 WL 625727 (D.C. Cir. Mar. 1, 2022) (per curiam).

For the third prong, a plaintiff may establish a causal connection "by showing that the employer had knowledge of the employee's protected activity, and that the [retaliatory] personnel action took place shortly after that activity." *Cones*, 199 F.3d at 521 (quotation omitted).  When an adverse action occurs "very close" to protected action, a court may infer causation, but courts

---

[7] This remains so after *Chambers*, where the Circuit clarified that its rejection of the "objectively tangible harm" requirement under Title VII's anti*discrimination* provision is "fully consistent" with existing law on Title VII's anti*retaliation* provision.  *See* 35 F.4th at 876–78.

are less inclined to do so when there is a long delay.  *See Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273–74 (2001) (citing approvingly cases finding temporal proximity of three and four months insufficient to show a causal connection); *Jones v. D.C. Water & Sewer Auth.*, 922 F. Supp. 2d 37, 42 (D.D.C. 2013) ("[T]his Circuit has generally found that a two- or three-month gap between the protected activity and the adverse employment action does not establish the temporal proximity needed to prove causation.") (collecting cases).  Even at the pleading stage, courts will dismiss a retaliation claim where the plaintiff "rel[ies] exclusively on temporal proximity to establish causation" and "does not advance any factual allegations in support of his retaliation claim" that allow a court "to infer that the alleged sequence of events was 'very close.'"  *Maestre v. SDH Servs. E., LLC*, No. 18-cv-2494 (RC), 2019 WL 7037484, at *7 (D.D.C. Dec. 20, 2019) (citation omitted); *see, e.g.*, *Jones*, 922 F. Supp. 2d at 42 ("As [the statutorily protected] comments may have been voiced many months before [the plaintiff's] termination—and as no additional facts allege a causal link—Plaintiff's Complaint does not establish an inference of causation.").

Brown alleges that, on February 13, 2018, she initiated an EEO complaint and, the next day, after emailing Bracken to notify him of this, Brown received an email from Bracken, stating, "[W]e plan to have you lateral into the Program Manager duties for the Falcon Role."  Compl. ¶¶ 20–21.  Within a month, Defendant transferred Brown to FALCON, after which it promoted Campanella to acting section chief.  *Id.* ¶¶ 22–23, 25.  Later, Defendant transferred Brown to HSINET/SharePoint.  *Id.* ¶¶ 28–29.  She alleges that both transfers to "less prestigious and less desirable" positions and her non-selection to acting section chief were "retaliatory." *Id.* ¶¶ 33, 37. Brown also contends that Defendant retaliated against her by "intentionally exclud[ing]" her from "meetings, high level briefings, and any significant correspondence related to those programs classified as 'law enforcement systems' such as FALCON."  *Id.* ¶ 33.

Those allegations do not state a retaliation claim.  The complaint suggests that Brown's engagement with the EEO process was the statutorily protected activity on which all her retaliation claims rest.  *See* Compl. ¶ 36; *Richardson v. Gutierrez*, 477 F. Supp. 2d 22, 27 (D.D.C. 2007) ("It is well settled that Title VII protects informal, as well as formal, complaints of discrimination.").  Thus, the Court examines the relationships between that activity and the claimed materially adverse action.

First, her retaliation claim based on her transfer from BEAP to FALCON must fail because, given the undisputed timing of events, there could not be any causal link between that transfer and her EEO complaint.  When Brown notified Bracken on February 14 that she had begun the EEO-complaint process, Compl. ¶ 21, she had already been told almost a week beforehand that Defendant planned to transfer her, *see* ECF No. 13-3 at 7.  Indeed, she alleges she had been program manager at BEAP only "[*p*]*rior* to February 8, 2018," confirming some change to her employment status as of that date.  Compl. ¶ 19 (emphasis added).  Thus, Brown's engagement with the EEOC—and notifying Bracken of that fact on February 14—postdated Defendant's decision to transfer Brown and so could not have caused the resulting transfer.  *Cf. Carter v. Greenspan*, 304 F. Supp. 2d 13, 30 (D.D.C. 2004) ("Because [Plaintiff's] supervisors' dissatisfaction with his performance and their intentions to terminate him predated his protected activity, his retaliatory discharge claim is illogical and must be dismissed.").

Brown's retaliation claim based on her second transfer from FALCON to HSINET/SharePoint fails too because she has not alleged facts implying that this transfer constituted a materially adverse action.  "A 'lateral transfer'—that is, a transfer involving 'no diminution in pay and benefits'—may qualify as a materially adverse employment action if it 'result[s] in materially adverse consequences affecting the terms, conditions, or privileges of the

plaintiff's employment.'" *Mamantov v. Jackson*, 898 F. Supp. 2d 121, 128 (D.D.C. 2012) (citation omitted). A "reassignment of duties may be materially adverse if it places the employee in a position with 'less responsibility and fewer opportunities for compensation and advancement,' or results in the 'loss of supervisory responsibilities.'" *Id.* at 128–29 (citation omitted). But if "a plaintiff provides only expressions of subjective dissatisfaction with her new position and fails to allege that the transfer had any objectively adverse consequences, she has failed to show that her lateral transfer was materially adverse." *Craig v. District of Columbia*, 74 F. Supp. 3d 349, 376 (D.D.C. 2014). For instance, one court dismissed a plaintiff's transfer-based retaliation claim because the plaintiff did "not sufficiently describe any adverse effects" that resulted from the transfer. *See Brooks-Miller v. England*, 357 F. Supp. 2d 197, 203–04 (D.D.C. 2004). The plaintiff there had alleged that her transfer "diminished her future promotional opportunities" and "further reminded plaintiff that promotions and / or awards are not based upon merit and / or qualifications." *Id.* at 203 (alterations adopted). But the court held these "mere assertion[s]" were not enough because the plaintiff "fail[ed] to note any changes in employment status, necessary skills, job functions, or compensation levels." *Id.* at 203–04. Thus, the court was "left with no plausible explanation as to why the plaintiff consider[ed] [her transfer] to be an adverse employment decision, or why such transfer would diminish her promotional opportunities." *Id.* at 204.

Here, too, Brown has failed to allege facts that would show, as a matter of law, that her transfer to HSINET/SharePoint was "adverse." She alleges that she held the position of "Program Manager" "during the time period that is the subject matter of the present litigation." Compl. ¶ 8. Although different substantive priorities no doubt accompany different programs, Brown alleges no facts implying that "materially adverse consequences," *Mamantov*, 898 F. Supp. 2d at 128

(quotation omitted), or "any changes in employment status, necessary skills, job functions, or compensation levels," *Brooks-Miller*, 357 F. Supp. 2d at 204, also accompanied her transfer.  In one sentence, subsuming both her transfers, Brown alleges only that they were to "less prestigious and less desirable" positions and that they were "humiliating and damaging to [her] professional reputation."  Compl. ¶ 33.  But these "mere assertion[s]" do not "sufficiently describe any adverse effects of her transfer."  *Brooks-Miller*, 357 F. Supp. 2d at 203.  Instead, her allegations are just "expressions of subjective dissatisfaction with her new position[s] and fail[] to allege that the transfer[s] had any objectively adverse consequences."[8]  *Craig*, 74 F. Supp. 3d at 376.  Thus, as Brown "has not alleged facts that could plausibly constitute a materially adverse action," the Court must dismiss her retaliation claim based on her HSINET/SharePoint transfer.  *See Redding*, 327 F. Supp. 3d at 144 (D.D.C. 2018).[9]

Finally, Brown's retaliation claim based on her non-selection to acting section chief also fails.  Most obviously, Defendant could not retaliate against Brown by failing to consider her for that position because there is no allegation that Brown ever made Defendant aware that she was interested in it.  *See supra* Section III.A.1.a; *cf. Gilliard v. Gruenberg*, 302 F. Supp. 3d 257, 285 n.5 (D.D.C. 2018) (rejecting retaliation claim based on non-selection when the plaintiff "removed her own name from consideration for the position, [so] no reasonable jury could infer a causal link

---

[8] Brown's voluntary agreement to transfer to HSINET/SharePoint also defeats any finding that this action was "adverse."  *See* Compl. ¶ 28; *supra* Section III.A.1.b; *see also Ramos v. Lynch*, 267 F. Supp. 3d 39, 50 (D.D.C. 2017) (dismissing retaliation claim based on voluntary transfer because the voluntariness "cast doubt on whether [the transfer] would qualify as an adverse employment action, and it certainly undermine[d] [the plaintiff's] claim that the transfer was somehow caused by defendant in retaliation for her protected activity").

[9] For the same reasons, Brown's transfer from BEAP to FALCON also could not adequately allege a claim for retaliation, assuming she could overcome the causation hurdle, which she has not.

between [the plaintiff's] protected activity and the [defendant's] nonselection of [the plaintiff] for th[e] position").

Brown's retaliation claims based on her transfer to HSINET/SharePoint and non-selection to acting section chief also fail because, as alleged, those actions were too far removed from Brown's alleged statutorily protected activity.  The non-selection occurred in August 2018 and the HSINET/SharePoint transfer in September 2018—respectively, over six and seven months after Brown notified Bracken that she had begun the EEO process.  Compl. ¶¶ 21, 25, 29.  Alone, those gaps are too long to imply causation and support a retaliation claim.  *See Breeden,* 532 U.S. at 273–74; *Jones*, 922 F. Supp. 2d at 42.  Thus, she must "advance . . . factual allegations in support of [her] retaliation claim[s]" that permit the Court "to infer that the alleged sequence[s] of events [were] 'very close.'"  *Maestre*, 2019 WL 7037484, at *7 (citation omitted).  But Brown alleges no other facts suggesting that these two alleged retaliatory actions stem from Brown's EEO engagement or any other statutorily protected activity.  *See Jones*, 922 F. Supp. 2d at 42–43 (dismissing without prejudice a retaliation claim that appeared to depend on a monthslong temporal gap and for which "no additional facts allege a causal link").  Relatedly, although Brown states generally that she was excluded from meetings, high-level briefings, and significant correspondence, Compl. ¶ 33, she does not allege a causal link between these exclusionary acts and any statutorily protected activity.  She does not even allege when these actions occurred, so it is impossible for the Court to infer any causal link.  *See, e.g.*, *Jones*, 922 F. Supp. 2d at 42–43; *Maestre*, 2019 WL 7037484, at *7.  In sum, the Court finds that Brown has failed to plead any

claim for retaliation and will grant Defendant's motion to dismiss the complaint's retaliation claims.[10]

### 3.      Brown Fails to State a Disparate-Impact Claim

Defendant next argues that Brown's claim for disparate impact under Title VII fails. Brown alleges that Defendant's hiring and promotion policies and practices improperly reserve certain positions for 1811 series employees, thereby excluding minority women, like Brown, from opportunities for advancement and consideration for supervisory positions. *See* Compl. ¶¶ 13–18. But Brown has not alleged sufficient facts to support her claim that Defendant's promotion policies caused a disparate impact on members of a protected class.

Discrimination by disparate impact occurs when an employment practice is facially neutral in its treatment of similarly situated groups but, in fact, "fall[s] more harshly on one group than another." *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003) (quotation omitted). Unlike a claim for disparate treatment, to support a successful disparate-impact claim a plaintiff need not show any "subjective intent to discriminate." *Id.* (quotation omitted). A plaintiff need only (1) identify a specific employment practice that (2) caused a disparate impact on one of the prohibited bases in 42 U.S.C. § 2000e-2(k). *See Lewis v. City of Chicago,* 560 U.S. 205, 212 (2010). "The requirement to identify the employment practice or practices responsible for the shortfall guards against holding employers liable for the myriad of innocent causes that may lead to statistical imbalances in a given workforce." *Davis v. District of Columbia*, 925 F.3d 1240, 1249 (D.C. Cir. 2019) (cleaned up). At the pleading stage, a "plaintiff is not required to prove that the employment

---

[10] In opposing Defendant's motion to dismiss, Brown tries to supplement her complaint's retaliation allegations by citing a "memo." ECF No. 24 at 11; ECF No. 24-1. But Brown may not now introduce and rely on that memorandum because it "is well settled law that a plaintiff cannot amend [her] complaint by the briefs in opposition to a motion to dismiss." *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 142, 160 n.7 (D.D.C. 2014). And Brown concedes this memorandum was "not included in [the] Amended Complaint." ECF No. 24 at 11 n.2.

practice caused a disparate impact," but "only needs to make allegations that state a 'cognizable claim.'" *Young v. Covington & Burling LLP*, 736 F. Supp. 2d 151, 161 (D.D.C. 2010) (quoting *Lewis*, 560 U.S. at 212).  It is, however, "not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Menoken v. McGettigan*, 273 F. Supp. 3d 188, 199 (D.D.C. 2017) (quoting *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005)), *aff'd sub nom. Menoken v. Pon*, No. 17-5228, 2018 WL 2383278 (D.C. Cir. May 9, 2018).

Generally, to survive a motion to dismiss, a disparate-impact claim must therefore show a disparity with statistical evidence.  *See Krodel v. Young*, 748 F.2d 701, 709 (D.C. Cir. 1984) ("Statistical evidence is crucial in disparate impact cases, where plaintiffs must show that specific employment practices select applicants in a racial pattern significantly different from that of the pool of applicants." (cleaned up)).  A lack of statistical data at the motion-to-dismiss stage is not necessarily fatal, but a plaintiff must still indicate in the complaint that she will later be able to provide some sort of statistical evidence to survive a motion to dismiss.  *Compare Jianqing Wu v. Special Counsel*, No. 14-7159, 2015 WL 10761295, at *2 (D.C. Cir. Dec. 22, 2015) (per curiam) (affirming case dismissal because plaintiff had no statistical evidence and did not "hint that he . . . [could] obtain" any), *with Menoken*, 273 F. Supp. 3d at 199–200 (denying motion to dismiss disparate-impact claim with no statistical evidence and noting "Plaintiff will now have to . . . come forward with the necessary statistical evidence").

Defendant first argues that Brown fails to identify a specific employment practice or set of practices.  ECF No. 22-1 at 22.  Here, the Court sides with Brown.  She alleges that the "discriminatory practice by Headquarters of the Defendant of promoting or providing temporary duty assignments to 1811s into lead program manager and supervisory roles in lieu of more

qualified 300 series employees is a systemic problem." Compl. ¶13. Brown later identifies the specific supervisory and managerial positions subject to this practice: "program managers, section chief, unit chief, DAD, etc." *Id.* ¶ 31. These positions are allegedly "written up for 1811s and because of this [0300 series employees] are not eligible to apply." *Id. ¶* 13. This, in turn, creates a "career ladder for 1811's but none for 300 series employees," which has resulted in a "disparate impact . . . upon minorities and female employees." *Id.* Thus, Brown has alleged a specific promotion practice.

Second, Defendant argues that Brown fails to establish a race- or sex-based statistical disparity among the supervisory positions she identifies. On this point, Defendant is correct.

Brown alleges facts from which, she maintains, the Court can infer that "underrepresented females, specifically minority females lack promotion opportunity." Compl. ¶ 15. For support, she alleges that she personally had to transfer her duties with FALCON to two white, male 1811 employees, and that Campanella, also a white, male 1811 employee, was later promoted to acting section chief despite Brown's superior qualifications. *Id.* ¶¶ 22–25, 34. For statistical support, Brown points to Defendant's 2018 report that shows that men made up 54.10% of ICE employees at GS-12 and below, 79.69% of ICE employees at GS-13 and GS-14, and 68.85% of the permanent "SES"[11] workforce. *Id.* ¶ 14. The report also reveals that white employees made up 52.46% of the ICE workforce at or below GS-12, while white employees make up 62.01% of the workforce at GS-13 and GS-14. *Id.* Similarly, the complaint alleges, men make up 86.88% of the 1811 workforce, of which 71.27% are white, *id.* ¶ 15, while more minority women (like Brown) make up the non-1811 employee workforce, *id.* ¶¶ 31–32.

---

[11] The Court assumes this refers to Senior Executive Service. *See Executive Opportunities*, DHS (Feb. 2, 2022), https://www.dhs.gov/homeland-security-careers/senior-executive-service-development.

These allegations—and the data Brown provides—are insufficient.  Although at this stage extensive statistical evidence of a disparity is not required, Brown must still provide information to plausibly show that a statistical disparity exists *among the group of people affected by the challenged practice*.  *See Jianqing Wu*, 2015 WL 10761295, at \*1.  Yet Brown fails to allege any statistical disparity among the specific positions that are the subject of the allegedly discriminatory practice she identifies.  She does not allege, statistically or otherwise, any race- or sex-based disparities among the program-manager, section-chief, unit-chief, or DAD ranks.  She does not say how many of those positions exist or their holders' races and sexes.  Brown's personal observation of Campanella's promotion, while perhaps relevant in the larger context of statistical disparities, cannot standing alone support a disparate-impact claim.  *See Boykin v. Fenty*, 650 F. App'x 42, 44 (D.C. Cir. 2016) ("[I]ndividual . . . experiences say nothing" about whether a policy has a disparate impact on a protected class as a whole.).

As for the statistics she does provide, Brown's complaint fails to adequately establish a causal link between them and the alleged discriminatory policy.  True, the statistics reveal that there are more white men among the higher GS levels at ICE and that 1811 series employees are predominantly white men *overall*.  But it does not then follow that Defendant's challenged promotion policy *related to managerial and supervisory positions* caused that disparity, rather than the "myriad of innocent causes that may lead to statistical imbalances in [Defendant's] workforce." *See Davis*, 925 F.3d at 1249 (quotation omitted).  For these reasons, Brown has not alleged that Defendant's policy for promotions has a disparate impact on protected classes to which she belongs, so she has failed to state a claim for disparate impact.

### B.      Brown Fails to State an Equal Pay Act Claim

Last, Defendant moves to dismiss Brown's Equal Pay Act claim because she failed to allege that she performed equally skilled work under substantially similar working conditions as her male colleagues who she alleges were paid more.  ECF No. 22-1 at 25–27.  The Court agrees.

To plead an Equal Pay Act violation, plaintiffs must state facts plausibly showing that (1) they were doing substantially equal work on a job, the performance of which required substantially equal skill, effort, and responsibility as jobs held by members of the opposite sex; (2) the job was performed under similar working conditions; and (3) they were paid at a lower wage than members of the opposite sex doing equal work.  *Savignac v. Jones Day*, 486 F. Supp. 3d 14, 30 (D.D.C. 2020); *see also Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974).

As to the first element, for Brown to sufficiently allege that she was "doing substantially equal work" as her comparators, she must allege "she worked as many hours or otherwise worked as hard as those who were paid more than she was."  *Savignac*, 486 F. Supp. 3d at 31 (quotation omitted).  She has not.  Instead, she alleges only that, in March 2018, she transferred her BEAP responsibilities to Teed and Campanella who went on to "conduct[] the same duties" as Brown but received an additional 25% of their base salary.  Compl. ¶ 23.  Similarly, Brown alleges, in September 2018, she transitioned to HSINET/SharePoint where she took on the "same role and responsibilities" as a male colleague, Bearon, but received 25% less pay because of Bearon's LEAP.  *Id.* ¶ 29.

Crucially, Brown glosses over LEAP—the very reason her male counterparts received 25% more.  LEAP is a form of congressionally authorized supplementary pay available to criminal investigators for "unscheduled" work in "excess of a 40 hour work week."  5 U.S.C. § 5545a(b); *see also* Compl. ¶ 16 ("Eligibility for [LEAP] is limited to criminal investigators who are properly classified in the GS-1811 series.").  For criminal investigators to receive LEAP, they must work

an annual average of two or more hours of "unscheduled duty" per workday.  5 U.S.C. § 5545a(d).  "[U]nscheduled duty" refers to "hours of duty a criminal investigator works, or is determined to be available for work, that are not--(A) part of the 40 hours in the basic work week of the investigator; or (B) overtime hours paid under section 5542."  *Id.* § 5545a(a)(3).  Applicable regulations refer to this as the "[s]ubstantial hours requirement."  5 C.F.R. § 550.183(a).  And criminal investigators must provide an "annual certification to the head of the agency attesting that the investigator currently meets, and is expected to continue to meet during the upcoming 1-year period, the substantial hours requirement in § 550.183."  *Id.* § 550.184(b).

Teed, Campanella, and Bearon each received 25% more pay than Brown because, in addition to the program-manager positions they held, and unlike Brown, they were 1811 employees.  *See* Compl. ¶¶ 23, 29.  To receive LEAP based on their 1811 classifications, Teed, Campanella, and Bearon necessarily had to work or be "available to work" an annual average of two or more hours of "unscheduled duty" per workday, and attest to those facts.  5 U.S.C. § 5545a(d); 5 C.F.R. § 550.184(b).  Otherwise, they would not have received LEAP.  *See* 5 C.F.R. § 550.183(a) (entitling criminal investigators to LEAP "only if" the substantial-hours requirement is met).[12]  Brown nowhere alleges that she, too, worked or was "determined to be available [to] work" an annual average of two or more hours of "unscheduled duty" per workday.  5 U.S.C. § 5545a(d); *see* 5 C.F.R. § 550.184(b).  In fact, she includes no allegations at all about the number of hours she worked or how many hours she worked relative to Teed, Campanella, and Bearon.

---

[12] To conclude otherwise, the Court would have to infer that Brown's male counterparts somehow circumvented LEAP's statutory requirements yet still received the extra pay.  But Brown makes no such claim.  And the Court need not adopt that inference, which is "unsupported by the facts set out in the complaint."  *Bowe-Connor*, 845 F. Supp. 2d at 84; *see also Long v. Safeway, Inc.*, 842 F. Supp. 2d 141, 144 (D.D.C. 2012) (requiring only "giving [the plaintiff] the benefit of every *reasonable* inference drawn from the well-pleaded facts and allegations in the complaint" (emphasis added)), *aff'd*, 483 F. App'x 576 (D.C. Cir. 2012).

She has therefore failed to allege that she worked the same number of hours as required to allege that she performed substantially equal work as her male comparators.  *See Savignac*, 486 F. Supp. 3d at 31.  Thus, she has failed to state an Equal Pay Act claim.

In her opposition, Brown reemphasizes the complaint's allegation that "misclassification of the 1811 series at headquarters results in the criminal investigator working a typical 8-hour workday while collecting availability pay for conducting the same or substantially equal work as their non-1811 counterparts."  Compl. ¶ 18; ECF No. 24 at 17.  She also alleges that the "nature of the duties and responsibilities of these headquarters[] positions negates the need for the 'substantial hours' requirement to claim availability pay."  Compl. ¶ 18; ECF No. 24 at 17.  These allegations do not save her claim.  After all, the substantial hours requirement is statutorily mandated.  And in any event, unscheduled duty is measured annually.  *See* 5 U.S.C. § 5545a(d)(2). So criminal investigators may work 8-hour days while assigned to certain temporary positions and then later complete their required unscheduled duty during the rest of the year or in other ways. Brown's allegation that the substantial-hours requirement has been "negated" as to any criminal investigators—let alone as to the comparators she identifies—thus finds no support.  And even if it did, "there is a difference between alleging that a plaintiff and her comparators' jobs *require* 'equal . . . effort' and alleging that the plaintiff and her comparators, in fact, *performed* 'substantially equal work.'"  *Savignac*, 486 F. Supp. 3d at 31.

Brown also repeats the complaint's allegations that "headquarters positions" assigned to 1811 employees "do not require the use of arrest authority" and that the 1811 employees are misclassified "into positions where the duties do not involve performing investigations related to specific acts of illegal or unlawful activity."  Compl. ¶ 17; ECF No. 24 at 16–17.  These allegations mistakenly assume that LEAP applies only to those who actually perform investigations.  LEAP

applies to "criminal investigators."  5 U.S.C. § 5545a(b).  Section § 5545a(a)(2) defines "criminal investigator" by incorporating the definition for "law enforcement officer" provided in Section 5541(3), which itself incorporates the definition in Section 8331(20).  Section 8331(20) then defines a law enforcement officer as an "employee, the duties of whose position are primarily the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, *including an employee engaged in this activity who is transferred to a supervisory or administrative position*."  5 U.S.C. § 8331(20) (emphasis added).  Teed, Campanella, and Bearon were special agents reassigned to such supervisory and administrative positions.  Compl. ¶¶ 22, 29.  As a result, there is no reason to question that they were eligible for LEAP while in those roles.

Brown has accordingly failed to state a claim under the Equal Pay Act because she has not alleged that she performed substantially similar work as Teed, Campanella, or Bearon.  *See Savignac*, 486 F. Supp. 3d at 31.  Thus, the Court will dismiss her Equal Pay Act claim.

## IV.    Conclusion and Order

For all these reasons, it is hereby **ORDERED** that Defendant's Partial Motion to Dismiss, ECF No. 22, is **GRANTED**.  It is further **ORDERED** that Plaintiff's amended complaint, ECF No. 20, is **DISMISSED WITHOUT PREJUDICE IN PART**, except insofar as it pleads a disparate-treatment claim based on Plaintiff's transfer from BEAP to FALCON.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: May 8, 2023